Good morning, your honors. My name is Rafael Del Castillo, and I represent the relators in this case, Dr. Robert Wilkinson, who is the du jour and has for decades been the du jour chief of the practice of pediatric hematology oncology in the state of Hawaii, and his partner, Dr. Woodruff, who at the time was the leading clinical practitioner of bone marrow transplant in pediatric hematology oncology in the state of Hawaii. I'd like to reserve five minutes for rebuttal. This case was not ripe for summary judgment. That's the key issue that we attempted to present to the Court of Appeal in this case, and one of the most pressing concerns that we have about this case is that the court's decision overthrows the regime that protects the public in medical practice. Let me explain myself. Payment criteria and credentialing requirements are a part of the fabric of medical practice and the regulation of medical practice in the United States, and certainly in this state. We repeatedly pointed out to the court that anyone with a medical license can perform spinal taps, bone marrow biopsies, and even conscious sedation on an infant in this state. That's all they need. Payment criteria and credentialing requirements ensure that they're not going to be economically rewarded for that. We have credentialing requirements in hospitals, and we have credentialing requirements in government-funded programs and insurance plans, and of course it is the government-funded programs, payment criteria, and credentialing requirements that are at issue in this case. What this court has done, it has decided that the credentials of the court are sufficient for them to engage in practice, and that flies in the face of a case that was cited by the defense at page 32 of the answering brief in which it was said, and that's the Mikes versus Strauss case, courts are not the best forum to resolve medical issues concerning the levels of care. State, local, or private medical agencies, boards, and societies are better suited to The court has said that the nurse practitioners in this case were qualified. It's made the decision that the Mikes case said that the court is not really properly constituted to do, and therefore it was okay for the hospital to bill for the claims. That circumvents the medical director of the Medicaid agency, Dr. Honbo, whose testimony was not allowed in this case because the magistrate determined that we could have her testimony at trial. Well, obviously we didn't get to trial. It may be that this case can be decided on summary judgment, but it can't be decided without Dr. Honbo's testimony, which, as we pointed out to the court in another case, was, had I known that these procedures were being performed by nurse practitioners and the hospital was submitting bills on UB 92s, we would not have paid them. Well, the question is, it's a little hard to unravel everything from your brief as to precisely what you're challenging. The false certification you're challenging is on the UB 92? The false certification was the certification on the annual report, Your Honor. Well. And that's what we, that's what we said in the complaint and that's what we said in the motion for summary judgment. But is the annual report, what statute is in violation, what's the statutory violation or the certification violation? This is, this is discussed in our reply brief, but what we. Your reply brief wasn't enough. I mean, what, you have to raise it in your opening brief. What precisely is the certification or statutory violation that you want us to benchmark your case against? As we pointed out, Your Honor, it's the federal share law and regulation, which is cited and actually produced in its entirety in our complaint. The federal share regulation requires that the state recover within 60 days any, any payment that it has determined as an overpayment because it affects the federal share. That doesn't give us a violation of something. In other words, in the False Claims Act, you have to falsely certify or submit a false claim. Or in the case of an implied false claim, you need to show that the statute is both a participation and a payment statute. So you can't just sort of throw out the regulation and say they violated the regulation. What precisely did they violate that we can look at that they signed? What piece of paper and what? And if you can't tell us that, then it's not our job to go through 5,000 pages of federal regulations and try and figure it out. Not at all, Your Honor. So what should I look to? And, and it's, it's the, of course, the precision with which this is presented shouldn't, the requirement should not be that we are overly focused on precision when we have a case in which there is an overriding federal statute governing the federal share of payments to the state that says all payments that the state makes to a medical provider have got to be in compliance with all of the federal laws and the state regulations and laws. And what federal law was violated? That is the federal law that was violated. No, that's not enough. It's not, it's. You can't just say you have to be in compliance with federal law. Tell us what federal law they're not in compliance with. Then we can take a look at that and see if there's a basis to sustain going forward. What we have pointed out to the court is that the federal share law and regulation provides the foundation. Based upon that foundation, the state is required to enforce payment regulations. Okay. The state has payment regulations and if the state doesn't enforce those payment regulations, then the state must refund the federal share. What the entity did was certify that it was in compliance with all laws and regulations and that includes the payment requirements of the state Medicaid agency. And what, in your view, what specific law was the agency not in compliance with? The specific law that the agency was in so far as Medicare and Medicaid is concerned. And it is a chain of law that we're trying to point out here is in play. And the chain of law begins at the top with the federal share law. But the enforcement mechanism is the regulation from the Medicaid agency that says we don't pay unless a doctor supervises the procedure. If there is an invasive procedure performed, we don't pay unless that procedure is performed with a doctor present. So you're saying that there were procedures performed that were not supervised by a doctor? That's correct. And where the record can we go to ascertain what specific procedures were performed absent doctor supervision? I'm going to ask for a little help for a citation precisely for the court here from my co-counsel while I respond to that. She can look it up while you go on. Another thing that was a little bit uncertain to me from the briefs is that you argued that the district court made its determination based on Medicare rather than Medicaid law. And can you point me to where in the district court order I would look as the basis for that challenge? I can't. I beg your pardon. I thought I had it highlighted here. You're at five minutes. Do you want to sit down and look for your record sites and then remain for rebuttal? That might be the best thing. Thank you. We'll hear then from Hawaii Pacific Health. Please, the court. I believe that we have covered all the issues in our brief and I have no intention, I don't think the court wants to hear me recite what is in the brief, but I'd like to make several, just highlight several points that have come up. The first thing you should recite is your name. Excuse me. My name is Harry Silver. I am representing the defendants at the lease in this matter. Great. The question that Judge McEwen asked relators to counsel is the same question that Judge Seabright asked in the district court at least three times. What is the specific rule, regulation, or statute that the defendants were alleged to have violated? It's like that old commercial, where's the beat? Where's the fraud? That's the question. Right. I agree. Relators counsel was never able to come off with any. And throughout the relators briefs in this court is the theme that somehow the district court was out to get him, out to help us, was on our side for whatever reason. When in truth, the district court went over backward and gave every possible chance to the relators to come up with a plausible, comprehensible theory of fraud in this case. As near as I can tell, the allegation is that procedures were performed by nurse practitioners that should have been and were not supervised by physicians. That is one of the issues that are raised and there is nothing in the record, there is nothing cited for the proposition that physicians were required to perform certain procedures. Or to supervise them. Or to supervise them. Well, I think that one of the claims that I defined was that while they talk about HICVA forms, they also talk about this UB 92 form. Right. And there may be a claim that those forms are facially inaccurate because you're inserting doctor names where there's no doctor. That's the best I can understand the claim. So what would be Hawaii Pacific's response to that? Our response to that, Your Honor, is that by listing a physician's name in one of those fields does not necessarily mean that that is the physician who performed the procedure in question. Field 82 asks for the attending physician and under the instructions by the Hawaii UB 92 provider manual, which is the only authority we could find that sheds any light on this. And since relators have not come up with anything else, this is the governing document. And it defines attending physician as the name or number of the physician who would normally be expected to certify medical necessity and has primary responsibility for the patient's care and treatment. It does not mean the person who performed the procedure. The relators took the deposition of representatives from Aloha Care, who at the time was the fiscal intermediary for Hawaii Medicaid. And they testified that given the definitions of those forms, it would not be misleading and they would not necessarily expect to see if a doctor's name is listed, they would not construe that as being that the doctor performed the procedure. Well, what about their claim that there's an overall kind of an overarching certification that we abide by all the rules and sign off and therefore we get our federal payment? Aside from the fact that I am not aware of any case that has gone that far and read a certification like that that broadly. That gets back to there is nothing here that was violated. The nurses were all qualified to perform the procedures that were performed here. And this is a matter of applying the law to the facts, which a court is quite capable of doing. You do not need the deposition and testimony of the former head of Hawaii Medicaid to say what the law is. And in fact, if you need testimony to decide what the rule is or to reveal what the rule is, that's secret law. I mean, it's not enforceable and certainly can't give rise to fraud. So that all, as we've cited in our brief, Hawaii statute section 457-8.5 lists the qualifications for advanced placement, advanced practice registered nurse. Except for paying the appropriate fees, all of these nurses had these qualifications. A current unencumbered license as a registered nurse, an unencumbered recognition as an advanced practice registered nurse, a master's degree in nursing or a current certification for specialized and advanced nursing practice from a national certification body. There is no dispute that these nurses met every one of these qualifications except paid the appropriate fee. To me, the sort of underlying question here is whether Medicaid paid based on these forms, whether they were misled. And there's no evidence that they were. Well, one of the things that your opponent says, and I'd like to hear you address it, is they wanted to call a witness who would sit down under oath and you show the witness one of these forms and say, would you have approved this for payment if you knew A, B, C, D? What's wrong with that? Is there such a person? That's Dr. Honbo, who we've been talking about. Dr. Honbo is the former head of state Medicaid. She testified previously in a parallel state court proceeding. And, you know, once again, I would say there is a real problem if you need a former head of an agency to tell you what the rule is. For the purpose of this question, I'm not asking about a rule. Is there a person somewhere in the hierarchy of Medicaid that is competent to say and testify under oath that the information contained in these forms was, if they had known everything about the procedures, they would or would not have reimbursed? Is there such a person? The Aloha Care people testified and said that they were not misled or would not have been misled. Dr. Honbo testified in the state court proceeding. Her testimony is in a supplemental excerpt of Record 93 through 96. And she said she would not know who actually performed the procedure from a UB-92. Quote, we couldn't tell that from the UB-92 claim. We couldn't tell whether the emergency room doctor did it, the nurse did it, the hospital tech did it, the volunteer did it. We couldn't tell. When the hospital submits it, we take it that the hospital provided it, because in this instance with the UB-92, the hospital is our provider. And the UB-92 seeks reimbursement for ancillary costs, overhead, use of the room, bandages, not the professional fee. Is the professional fee billed by the physician or by someone else? By the facility, by the hospital. So is the fee for service based on the nature of the provider or the nature of the event? You mean under the UB-92? In general. Well, there are two forms here. There's the 1500, which the physician fills out for professional services, and that certainly depends upon the nature of the service provided. There was obviously a dispute between your client and these particular doctors earlier, correct? Did that relate to the HCFA 1500 form and whether it was being filled out and their services either weren't being provided or not being provided by those people? The dispute was that the hospital had an internal rule that physicians could not bill on a 1500 if the procedure was performed by a nurse. By a non-physician. Yes. So in those cases, there was some kind of settlement and the hospital paid up or reimbursed backwards to Medicaid? Well, it wasn't a settlement. It was a self-disclosure. Self-disclosure and a disgorgement of various claimed fees. Correct. Okay. Yes. So that is the professional component, the 1500. This is the hospital overhead, and that has really nothing to do with what the physician did. It's the hospital's costs. Is there any claim under the 1500 forms here as you understand it? Any claim of false certification by your client? No, Your Honor. The 1500 has absolutely nothing to do with this case. And that's because only individual doctors or groups of doctors would fill out that form? That's correct. Not the hospital. That's correct. And at the risk of muddying the waters, but I just want to make this point, on physician supervision, I believe that relators have interjected the so-called incident to rules, which relate to a 1500 form into this case. And under those rules, that is where, say, a nurse gives a flu shot in the doctor's office under the doctor's supervision, and the doctor submits a 1500 for it, bills for it. There are rules in governing the degree of supervision required of the physician in order to submit a claim for the fee, supervision rules. That has nothing to do with this case. What this case is about is the hospital facility fees. And the relator has never come up with any rule or regulation or order or anything else that was violated here. And, in fact, in the complaint, and the relator's own expert, Mrs. Birkenshaw, have said that the procedures must be performed by a physician or other licensed medical professional. And we submit that these nurses were licensed medical professionals. Thank you. Mr. DelCastillo, I think you have some time left. Thank you, Your Honor. It is correct that we have no incidences in which we were able to find a HCFA 1500 form related to these UB92 forms. So the relators were not able to introduce any HCFA 1500 claims that were false, as far as the case was concerned. That's not to say that we would not have found them in discovery, but they were not part of our complaint. So the case specifically concerns the issue of indicating on a UB92 that a physician was present and supervising a procedure when the physician was not. Could you respond to the motion for summary judgment by saying that additional discovery specifically listed might provide you with responses to the heart of the motion? We did, Your Honor. What is it, 54B, you did that? We did, Your Honor. And what did the court do with that? We had two successive 56F motions in connection with this motion for summary judgment. In between times, we went to the magistrate for an order to compel Dr. Hombo to testify because her employer, who was a state contractor, was refusing to have her show up for her deposition. So we looked for a motion to compel. That's not to say that Dr. Hombo was unfriendly to us. We've known her for many years. But her employer was not allowing her to appear. And what the magistrate decided was that this was while the case was in 56F delay for the motion hearing, decided that Dr. Hombo's testimony could be given at trial. And she need not be disturbed until such time as she was either going to be appearing for trial or appearing for a preservation deposition. So Judge Seabright was very well aware that Dr. Hombo's testimony was not going to be included. And Dr. Hombo was the interpretive authority. That's what underlies the issue about supplanting Medicaid with Medicare. Because in the court's analysis, and that's ER 37, it starts there, of UB 92s, the court analyzes the UB 92s under what was available to the court without Dr. Hombo's testimony, which was Medicare rules. One of the concerns I had is in your opening brief, the judge said that the forms were not facially false. And you didn't challenge that in your opening brief, did you? We did challenge it, Your Honor. I guess apparently not facially so. But that was the principal challenge. It was the principal argument in the case, and it appears that from your assessment that we just simply didn't make the point clearly enough. That's why we're asking these questions. Yes. Let's go back and maybe you've found some citations. Specifically, where in the district court record of his opinion does he mix up Medicaid and Medicare? In the analysis that begins at ER 37 in the order granting summary judgment, he analyzes the UB 92s according to the Medicare rules. Where does it say that? Well, you have to ‑‑ excuse me. It doesn't specifically say, but what he's referring to is the Medicare rules, because that's all that was available. Well, show me, I'm just asking where in his opinion he references a Medicare rule under his statement that UB 92s are not facially false. That's right. Where is the Medicare rule that he references? I don't believe that it is specifically cited in his opinion, but let's see. There are excerpts, because he did discuss the language in terms of what the UB 92 guidance says. Your argument is that the district court mistakenly applied Medicare rules to a Medicaid situation? I'm not sure it was mistaken, Your Honor. It was erroneous. Okay, substitute the word erroneous. That's your contention? Yes. Yet you cannot point us to any specific point in the district court's opinion where that was done? I can't point you to anything in the district court's opinion where the district court says, I'm going to apply the Medicare rules here, but the rules that he's applying are rules, rather than the Medicare interpretation. But you haven't shown us anywhere where his opinion, in which if your statement is accurate, somehow differs from the Medicaid rules and that the Medicare, Medicaid rules, or even that the rules are what's at issue here. Well, that's the point, Your Honor. The Medicaid rules reside in Dr. Honbo. No, they don't. They reside in the Code of Federal Regulations, not in Dr. Honbo. Well, the Code of Federal Regulations doesn't actually set forth Medicaid rules governing UB 92s or for 1500s. Well, the state regulations would. I beg your pardon? There's got to be a regulation. Dr. Honbo is not some freestanding source of federal health care law. Well, that's what is important about developing the facts in this case, because in this state there is a framework of regulation, but specific cases aren't dealt with, and they aren't in any state. When you get involved in a particular practice that has so many rules and overlays of credentialing, such as pediatric oncology. But all of those decisions have to be rooted in the state regulations. They have to be rooted. They have to be outlined in state regulation. There has to be a state regulation that is relied upon, but they are interpreted by the administrator of the Medicaid program. Well, you haven't yet even pointed to a regulation that needs to be interpreted, so your time is up, but I'll give you one last chance to answer the initial question, and that is, what is the specific statute or regulation that was violated here that forms the basis for the false claim? Well, our position, again, Your Honor, was that the statute that was violated for the false claims was the federal law, the federal share law. That's it. You don't have any more specifics. That's it. That's it. We'll take that as your final answer. Thank counsel for your arguments. The case of the United States v. Hawaii Pacific Health is submitted.
judges: Hawkins, McKeown, Rawlinson